J-S34018-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.D.E., MOTHER | : | |
| | : | No. 584 WDA 2022 |

Appeal from the Order Entered April 19, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at CP-02-AP-0000228-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: K.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.D.E., MOTHER | : | |
| | : | No. 586 WDA 2022 |

Appeal from the Order Entered April 19, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at CP-02-AP-0000229-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.D.E., MOTHER | : | |
| | : | No. 587 WDA 2022 |

Appeal from the Order Entered April 19, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at CP-02-AP-0000230-2021

BEFORE:   DUBOW, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY MURRAY, J.:                    **OCTOBER 21, 2022**

J.D.E. (Mother) appeals from the orders involuntarily terminating her parental rights to her three daughters, K.W., K.L.W. (a/k/a K.W.), and M.W.[1] Upon review, we affirm.

K.W., K.L.W. and M.W. (Children) are the three youngest of Mother's eight children.  K.W. and K.L.W. are twins, born in October 2018; M.W. was born in May 2020.  The family has been involved with the Allegheny County Office of Children, Youth & Families (CYF) since 2001.  The orphans' court explained:

> Mother and Father have a lengthy history with CYF in Allegheny County.  Their oldest child was born on August 17, 2001, and CYF referrals date back to 2001, when he was a baby and removed from their care.  Beginning in 2008, the referrals to CYF became more "consistent," according to the caseworker.  In March 2018, CYF received a referral that the parents' oldest child was locked up inside the home and was not "let out to go to school, use the bathroom, shower or eat."  Their oldest child was removed from their home and a corresponding Childline [report], for unreasonably restraining or confining a child, was subsequently indicated.  CYF filed a petition for dependency on the oldest child and three other children [not K.W., K.L.W. or M.W.] that were residing in the home at the time.  The oldest child was adjudicated dependent and CYF withdrew the petitions on the three other children in July 2018.  Because the oldest child was dependent, CYF remained active with the family and provided various services, which included bus tickets to assist with transportation

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court also terminated the parental rights of L.C.W. (Father), who has appealed at 570 WDA 2022, 571 WDA 2022, and 572 WDA 2022. This Court consolidated Father's appeals on May 31, 2022, and listed Father's appeal for disposition by this panel on October 3, 2022.

needs. The caseworker testified that fifty tickets were requested and provided in October 2018, which corresponded to when [] K.W. and K.L.W. were born.

In late November 2019, CYF received a referral from Children's Hospital regarding the twins. Dr. Adelaide Eichman, a stipulated expert in child abuse and pediatrics, testified about her involvement with K.W. and K.L.W. at the time of their admission to Children's Hospital of Pittsburgh on November 26, 2019. Dr. Eichman testified that upon examination,

> the twins were 13 months old. The girls were quite small. They weighed about 11 pounds, which is roughly the size of a two-month-old. So the girls were very tiny in terms of height and weight. They had badly controlled eczema on their skin. And the girls were developmentally delayed. They were at the level of a nine-month-old, approximately, at that point.

The twins were also found to have Vitamin D deficient rickets, which per Dr. Eichman, is a bone condition caused by a lack of Vitamin D in their diet prior to the hospital admission. Dr. Eichman testified that she recommended hospitalization for two reasons. Dr. Eichman said that the twins were so malnourished that they exhibited signs of refeeding syndrome, due to electrolyte abnormalities, which required the refeeding to be done slowly and carefully. Dr. Eichman also recommended hospitalization to ensure that the twins did not have an underlying medical condition that was the cause of their low weight. Parents were not receptive to the twins being hospitalized, per Dr. Eichman.

Dr. Eichman testified her medical conclusion was that the twins did not have a medical condition that prevented them from gaining weight and that their low weight was a result of an inadequate diet. Mother told Dr. Eichman when the twins were initially hospitalized, that the twins were breastfeeding every two hours, that they were on a vegan diet but ate chicken fingers, and Mother was giving them some kind of supplement. Dr. Eichman testified that Mother stated "she kept herself alkalined" but Dr. Eichman was not familiar with what kind of diet that was.

Dr. Eichman stated that the twins did not have celiac disease. Additionally, the eczema that they had, while a common skin condition, was not well-controlled and as a result[,] the twins

were scratching quite a bit until it cracked and bled. Dr. Eichman also testified that the children each functioned with the developmental abilities of a nine-month-old, despite being thirteen months of age. The parents reported to Dr. Eichman that the twins "had many words;" however, Dr. Eichman had only heard them babble. Dr. Eichman testified that the twins were observably different, in that they were smaller and not as developmentally advanced for their age, and a reasonable caregiver would be able to recognize that they were not on track with growth or development. After their admission on November 26, 2019, the twins were discharged from the hospital on December 5, 2019, to the care of their parents. The parents met with the nutritionist and the general pediatrics team during the twins' hospitalization, and they were provided with verbal and written instructions regarding their care and feeding, per Dr. Eichman. Additionally, multiple weight checks were scheduled for the twins post-discharge, which included bringing them into the office and a home nurse coming to the family home. Dr. Eichman testified that during their hospitalization, the twins were gaining, on average, twenty grams per day, which was viewed favorably in the light of the feeding schedule put in place to avoid refeeding syndrome.

Despite the instruction and education provided to the parents, the scheduled appointments for weight checks in the home and the doctor's office, and the evidence that the twins were capable of gaining weight as demonstrated during their hospitalization, the twins were readmitted to Children's Hospital in January 2020. Dr. Eichman testified that the readmission was due to the fact that they were not showing the weight gain that would have been expected while in Parents' care and because the parents had missed several of the twins' doctors' appointments. Moreover, the eczema that had been treated with topical steroids had not improved while in Parents' care.

CYF obtained an Emergency Custody Authorization to remove the twins in January 2020 and the caseworker testified that at the time of the removal the twins appeared very small. Mother had told CYF that she had the twins "on a vegan diet and that she was also breastfeeding but also feeding them smoothies with fruit, hemp seeds, walnut milk." The caseworker testified that despite being hospitalized twice in a two-month time frame due to nutritional deficiencies[,] and discussions with the parents about the severity of the twins' presentation in November 2019[,]

- 4 -

Mother and Father did not seem to understand how serious the situation was.

After the twins' removal in January 2020, CYF put in Homebuilders, a thirty-day intensive in-home services program, to support the family. Homebuilders' goal, per CYF, was to work with the parents with scheduling and keeping appointments and addressing the children's needs. The parents did not appear to gain any additional insight from these services and Homebuilders suggested that Parents receive a neuropsychological evaluation, as well as in-home mental health services. The caseworker testified that the twins were placed into [a] foster home at that time and eventually moved into a relative['s] foster home in April 2020.

Mother had her eighth child, M.W., on May 16, 2020, and CYF obtained an Emergency Custody Authorization that same day. At the hospital discharge, the newborn[, M.W.,] was placed into the same relative['s] foster home as the twins. The twins were adjudicated dependent on May 20, 2020. CYF filed a petition for dependency on [M.W.,] the newborn, based on the significant concerns the agency had with respect to the parents' ability to appropriately feed and follow through with medical appointments. M.W., the newborn, was adjudicated dependent on June 25, 2020. Between the November 2019 hospitalization and the January 2020 hospitalization, twelve Childline [reports] were filed and indicated against Mother and Father for causing serious medical neglect, failure to provide proper nutrition and hydration, and failure to provide proper medical care.

This [c]ourt need not recite the extensive findings within the permanency review orders with respect to Mother and Father, as they are evident within []CYF Exhibit 5 - Certified Court orders. Without question, at the time the termination petitions were filed by CYF on November 4, 2021, and at the time of the termination proceedings on April 8, 2022, Mother and Father had made minimal progress towards remedying the issues and were in minimal compliance with the family service plan goals, despite CYF offering and providing services and evaluations aimed at efforts to reunify. *See* CYF Exhibit 5 - Certified Court Orders.

At the time of the termination hearing, the twins (K.W. and K.L.W.) were three and a half years old and had been in care twenty-seven consecutive months. M.W. was almost two years

- 5 -

old and had been in care her entire life, twenty-three consecutive months. Not subject to the instant matter, Mother and Father's oldest child resided outside of the home, and the three older sisters resided in the care of Parents, all four of whom are dependent.

Orphans' Court Opinion, 6/27/22, at 2-8 (record citations and footnotes omitted).

The orphans' court conducted the termination hearing on April 8, 2022. The Children were represented by legal counsel, "appointed by court order, after [the Orphans'] Court conducted a conflict analysis." *Id.* at 2. CYF presented testimony from Dr. Eichman; CYF caseworker, Ashley Hobbs; licensed psychologist, Dr. Terry O'Hara; and licensed psychologist Dr. Beth Bliss. Mother, Father, and Children's maternal grandmother testified in opposition to termination. By orders dated April 8, 2022, and entered April 19, 2022, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2),(5),(8) and (b). Mother timely appealed. Both Mother and the orphans' court have complied with Pa.R.A.P. 1925.[2]

---

[2] Mother filed separate notices of appeal for each child. At 587 WDA 2022, Mother failed to file her concise statement simultaneously with her notice of appeal pursuant to Pa.R.A.P. 1925(a)(2). On June 7, 2022, this Court ordered Mother to file her concise statement by June 17, 2022. She timely complied by filing the concise statement in the orphans' court on June 9, 2022, and in this Court on June 13, 2022. Thus, Mother has preserved her appellate issues. *See In re K.T.E.L.*, 983 A.2d 745, 747 n.1 (Pa. Super. 2009) (failure to simultaneously file a Rule 1925(b) statement did not result in waiver where appellant later filed the statement and there was no allegation of prejudice from the late filing). This Court consolidated Mother's appeals on June 15, 2022.

Mother presents the following questions for review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition[s] to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the children pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 10.

In reviewing Mother's issues,

our standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Supreme Court] discussed in *In re: R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

CYF has the burden to prove by clear and convincing evidence that its asserted grounds for termination are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). "[T]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* Under 23 Pa.C.S.A. § 2511, "the court must engage in a bifurcated process prior to terminating parental rights." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the focus is on the conduct of the parent pursuant to § 2511(a). *Id.*

### Section 2511(a)

With respect to grounds for termination under Section 2511(a), we need only agree "as to any one subsection in order to affirm the termination of parental rights." *In re A.S.*, 11 A.3d 473, 478 (Pa. Super. 2010). Here, we address the second subsection, which provides for termination when a parent's

> repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Section 2511(a)(2) "emphasizes the child's present and future need for 'essential parental care, control or subsistence necessary for his physical or mental well-being.'" *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (citation omitted). Grounds for termination under subsection (a)(2) are not limited to affirmative misconduct. *Id.* "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, her [parental] rights may be forfeited." *Id.* at 83. The grounds for termination under § 2511(a)(2) may include acts of refusal as well as incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021). We have long recognized that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017).

Mother asserts the trial court erred in finding grounds for termination under Section 2511(a)(2). She argues:

> The record failed to provide sufficient evidence to make finding under 23 Pa.C.S. § 2511(a)(2). CYF failed to prove that Mother had a continuing incapacity … that caused the [C]hildren to be without essential parental care or that Mother cannot or will not remedy any such incapacity. The record demonstrates that Mother could provide proper care and control of the Children. CYF acknowledged that Mother provided nutritionally appropriate food during visitation. The [Child Health Evaluation and Coordination Services (CHESCS)] Nurse testified that Mother verbalized an understanding of the immunizations and well child checks and had a good understanding of the twins' allergies.
>
> It was also undisputed that the three older minor children in Mother's care never had nutritional issues or failure to thrive concerns. Mother's ability to provide essential parental care to

her other children is relevant. (*Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021)).

Mother's Brief at 17-18 (record citations omitted).

CYF counters that Mother has "been unable to do what is critical for reunification." Participant's Brief at 29. CYF further asserts that Mother has "not made progress in understanding, accepting, and acknowledging any aspect of why [her C]hildren are in care." *Id.* While Children's counsel acknowledges that Mother "has made progress on her court ordered goals," counsel further asserts that "the primary reason the [C]hildren came in to care continues to exist." Appellee Brief at 14.

As indicated by CYF and Children's counsel, the record supports the orphans' court's termination of Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2). The court addressed Mother and Father's shortcomings:

> With respect to 23 Pa. C.S. § 2511(a)(2), this [c]ourt found that CYF clearly and convincingly proved the requisite grounds. Goals were set forth for Mother and Father in order to remedy the incapacity, abuse, neglect or refusal that caused [C]hildren to be without proper parental care necessary for their physical and mental well-being. These goals included parenting, visitation, cooperation with service providers and the agency, and of significant import[], some demonstrated accountability and understanding of what happened that lead to the twins' severe malnutrition and developmental delays.
>
> Mother and Father's efforts on addressing the goals throughout this case could be best described as stagnant. At each and every permanency review hearing, the found that Mother and Father made "minimal progress" towards alleviating the circumstances which necessitated the original placement. Parents both appeared to be perpetually stuck and would regularly revisit the reasons why [C]hildren were removed and adjudicated dependent despite this [c]ourt, at each hearing, encouraging the

> parents to address the goals and ordering services to assist their efforts towards reunification.
>
> At the same time, CYF also made attempts to get Mother and Father to better understand what they needed to accomplish for these three young children to be returned to their care. Both parents, **and Mother in particular**, were extremely hostile toward the CYF caseworker and these hostilities increased as the case continued.

Orphans' Court Opinion, 6/27/22, at 12-13 (emphasis added). The court further found "it deeply troubling that the parents, at the time of the contested termination proceeding, continued to demonstrate almost a disconnect with their current situation." *Id.* at 14.

The record supports the orphans' court's analysis. The parties stipulated that Dr. Adelaide Eichman, from the Division of Child Advocacy at Pittsburgh Children's Hospital, was an expert "in child abuse and pediatrics." N.T., 4/8/22, at 6. In November 2019, Dr. Eichman diagnosed the twins as malnourished, and concluded they "did not have an adequate diet prior to their hospitalization." *Id.* at 8-9. Dr. Eichman recalled that neither parent "was receptive to the children being hospitalized." *Id.* at 9. Dr. Eichman opined that "a reasonable caregiver would recognize that the kids were not on track with their growth or development." *Id.* at 12. The Children improved at the hospital and were discharged to Mother and Father in December 2019. Dr. Eichman testified, "it was my diagnosis that the children had suffered from medical neglect." *Id.* at 17. Her "assessment [was] that the children's nutritional needs were not being met in their home environment"; she

confirmed the situation was "a near fatality for the children," and the parents took no responsibility. *Id.* at 17, 21.

CYF caseworker Ashley Hobbs testified to becoming involved with the family in January 2020. *Id.* at 26. However, CYF had "referrals and cases that dated back to 2001 when [the parents' oldest child] was a baby." *Id.* at 29. Ms. Hobbs stated that Mother "not understanding what [Children] need for nutrition is a huge concern." *Id.* at 35. The twins were placed in foster care and adjudicated dependent in May 2020; their younger sister, M.W., was born a few days later. *Id.* at 37. CYF obtained an emergency order for custody of M.W., who was discharged from the hospital and placed in foster care with her twin sisters; the court adjudicated M.W. dependent in June 2020. *Id.* Both parents had "liberal supervised visits ... with conditions that the parents could take one or both twins out into the community without supervision, not to exceed two hours." *Id.* at 40. The parents also had unsupervised visitation with M.W. *Id.* at 41. However, in October 2020, the parents alleged that the twins had been sexually abused. *Id.* at 42. The twins were evaluated at Children's Hospital and no abuse "was identified." *Id.* at 42. The visits were changed to being supervised at the parent's home. *Id.* at 43. The parents alleged sexual abuse of the Children again, during a visit, in September 2021. *Id.* at 45. Ms. Hobbs continued:

> There w[ere] a lot of issues surrounding developmental therapy for the girls, and the girls were unable to get the therapy unless they were at visits with their parents. But even then[,] they were late to appointments or they no-showed or they did not respond

- 12 -

to scheduled appointments. And therefore, it was decided after a permanency review [hearing], it was ordered on December 10, 2020, that [foster parents were] appointed secondary educational decision-makers so that the twins could [receive] the developmental therapy that they needed.

*Id.* at 46-47.

With respect to Mother's mental health, Ms. Hobbs testified Mother was referred to services, but she never acknowledged "to any service provider or the agency that [the parents] have problems and need treatment." *Id.* at 50. In January 2022, Ms. Hobbs emailed Mother about her missed mental health evaluations. *Id.* at 55. Mother responded that "she had to cancel her evaluation because of scheduling conflicts, as someone needed to be home with [her other] children during the school day." *Id.* When Ms. Hobbs emailed Mother about whether "there was a reason the evaluation for [Father] was cancelled as well," Mother answered:

> I didn't ask you to schedule the evaluations, Ashley. Quit putting your wrong words in an e-mail and trying to make it seem like it's coming out our mouths. I simply told you I reached out to Dr. Bliss to reschedule these evaluations and instead of Dr. Bliss calling us back to get that done, you all ran to each other like little kids would do and harped on that moment. Listen, unexpected things do occur in a person's life but that's not expected of you to give real news because you are a child. You have fabricated this whole ordeal since my babies were falsely removed and I finally heard it out of the horse's mouth, what I already knew, that my babies were medically kidnapped by the CYF system. I pray for you and the people you flock with. You are an evil person and God got the final say, not you or your system. Leave me with respect, peace, and knowing that you are full of crapola.
> Sovereign, [Mother]

*Id.* at 55-56.

- 13 -

Ms. Hobbs described Mother as cooperating with CYF "to a bare degree."

*Id.* at 61. She explained that Mother would

do the basic court[-]ordered things to a degree. However, to get these things accomplished, it takes a lot of time, it takes a lot of constant checking to make sure that appointments are being kept or [the parents are] meeting with the appropriate people. And so that has, I would say, caused progress to take more time than it should.

*Id.*

Dr. O'Hara, a licensed psychologist with expertise in child and forensic psychology, performed individual and interactional evaluations of the family in July 2020. *Id.* at 98. He conducted an individual evaluation of Mother. Dr. O'Hara testified, "from my perspective at the time there were significant issues – from my perspective, hypothetically speaking, with that level of concern, without any services, it would be difficult from my perspective to make progress." *Id.* at 105-06. He also stated:

[I]n [Mother]'s case, her struggling with a variety of treatment providers, that can sometimes be an indication of a personality disorder. Someone who has a lot of difficulties working with others and so forth can be an indicator -- one indicator for a personality disorder. That was a hypothesis that I didn't have a whole lot of evidence of at the time, but it was something I suggested should be explored in more detail.

*Id.* at 104-05.

However, Dr. O'Hara added:

I'm really limited in what I can say about the parties now. I haven't seen them in approximately two years. But at the time of the evaluations, it was my perspective that mental health

treatment and the services that I outlined in my reports were strongly advisable for both [Mother and Father].

*Id.* at 107.

Approximately two years later, in 2022, Mother was evaluated by licensed psychologist, Dr. Bliss. The parties stipulated to Dr. Bliss being an expert in child and forensic psychology. *Id.* at 117. Dr. Bliss performed individual and interactional evaluations of Mother, as well as Father, the Children, and the foster parents. Mother canceled her appointments with Dr. Bliss several times, and Dr. Bliss gave her "one more chance … it was her last chance. And she did show up for the March 8, [2022,] appointment." *Id.* at 119. In response to CYF's questions, Dr. Bliss testified:

[Mother] denied ever receiving any formal treatment. She's never been hospitalized or prescribed meds. She reported completing parenting classes. And the psych evals from Dr. O'Hara and the neuropsych … she said she was not aware of being given any diagnoses from these evaluations.

Q. And how would you report her insight and judgment?

A. I would say it's low.

Q. And why do you say that?

A. She also has the same defensiveness and guardedness [as Father,] to a more significant degree, but I had a lot of concerns in general with her functioning. She presented as extremely disorganized. Having difficulty recalling certain things. Distrusting of people in the system, almost to a paranoid level, reporting some almost delusional thinking. So there were concerns with her general cognitive functioning.

*Id.* at 125.

- 15 -

Dr. Bliss further addressing Mother's ability to parent, stating that Mother would

> [n]eed to show significant improvement of [her] understanding of the [C]hildren's medical needs and what happened and how [the parents] can ensure that it won't happen again in the future. Mom needs to better understand and get control of these cognitive symptoms … [which] greatly impact her ability to parent.

*Id.* at 131.

The orphans' court found the "testimony of Dr. O'Hara and Dr. Bliss further solidified" Mother's failure to progress toward "accountability and understanding of what happened with the twins." Orphans' Court Opinion, 6/27/22, at 22, 24. The court concluded Mother "had a goal to cooperate with service providers and CYF and … failed to make any modicum of progress … throughout the life of the case." *Id.* at 21. Accordingly, the court concluded that Mother's repeated and continued incapacity to parent caused the Children to be without essential care, and the incapacity could or would not be remedied. *See* 23 Pa.C.S.A. § 2511(a)(2). We discern no error in the termination of Mother's parental rights under Section 2511(a)(2).

### Section 2511(b)

Mother also argues the orphans' court erred in finding grounds for termination under Section 2511(b), which requires the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Mother claims that termination of her parental rights was contrary to the Children's needs and welfare because

Mother has a bond with Children, "who need the benefits they derive from their relationship with Mother." Mother's Brief at 23.

"Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). When the trial court considers a child's needs and welfare, the "extent of any [parental] bond analysis ... necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. 2008).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re A.S.*, 11 A.3d at 483 (citations omitted).

It is undisputed that Children have a bond with Mother. However, the twins have resided in the pre-adoptive home of foster parents since April 2020, and M.W. joined them shortly after her birth in May 2020. Ms. Hobbs testified:

> I have observed a clear and definite bond and attachment between the foster parents and the [C]hildren. … The girls seem very comfortable with the foster parents. They're very happy when they're around them. They smile, they go to them if they need something. They'll ask questions and say, auntie or uncle, can you get me this, can you do that. They often are sitting on

their laps or playing with them during my visits. And the [foster parents] are very attentive to their needs when they need something.

N.T., 4/8/22, at 62-63. Ms. Hobbs stated that the Children are "developmentally on target" and foster parents meet their emotional needs. *Id.* at 63.

In addition, Ms. Hobbs opined that termination was in the Children's best interest. She explained:

Because at this time, over the course of over two years, neither of the parents have taken any form of responsibility for any missed, no-showed, rescheduled doctors' appointments that essentially led their children to come into care. Over the two years that I have worked with them, there really has been minimal progress with respect to that.

And with respect to even acknowledging with other services, if a service does not occur, it's the [provider's] fault. It's not the parents' fault. They do not know how to take responsibility for even minor things that a person can take responsibility for. And that would … cause these [C]hildren to potentially be in harm's way moving forward as they get older. There's a concern that their educational needs are not going to be met. There's a concern that their medical needs will not be met. And any of their other basic needs may not be met due to the [parents'] lack of responsibility and acknowledgment across the board, not just specifically the reasons that the kids came into care.

*Id.* at 64-65.

The orphans' court credited Ms. Hobbs' testimony, as well as the testimony of Dr. O'Hara and Dr. Bliss. The orphans' court explained:

The [c]ourt does believe Mother and Father when they express their love for these three children. However, the twins have been in care twenty-seven consecutive months and the younger child has been in care since birth. The [c]ourt accepts the very credible testimony of Dr. O'Hara and Dr. Bliss, and agrees that that

- 18 -

termination meets the needs and welfare of these children and termination is in the Children's best interest. **These parents had two individual evaluations by separate evaluators roughly eighteen months apart and these evaluations demonstrated that neither Mother nor Father were any further along in gaining the necessary judgment and insight to parent these children**. Furthermore, Mother and Father failed to present any credible testimony or evidence to overcome the evidence that overwhelmingly supported this conclusion. **This [c]ourt found that any potential negative impact [from termination] would be mitigated by the fact that [Children] have been in relative placement this entire time and have exposure and contact with additional, extended family members, who also love and support them**. For these reasons, the [c]ourt did not commit an error of law or abuse of discretion in finding that termination best met the needs and welfare of these children.

Orphans' Court Opinion, 6/27/22, at 29-30 (emphasis added).

Consistent with the foregoing, we discern no error by the orphans' court in terminating Mother's parental rights under 23 Pa.C.S.A. § 2511(b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/21/2022

- 19 -